# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KEVIN MUELLER, )
        )
      Plaintiff, )
        )
      v. )      Case No. 4:13-CV-419-JAR
        )
CAROLYN COLVIN, )
ACTING COMMISSIONER OF SOCIAL )
SECURITY, )
        )
      Defendant. )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Kevin Mueller's ("Mueller") application for disability insurance benefits pursuant to 42 U.S.C. § 423 and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 1382.

## I.     Background

On October 23, 2009, Mueller protectively filed his applications for disability insurance under Title II of the Act, 42 U.S.C. §§401, *et seq.* (Tr. 156-64), and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq.* (Tr. 152-55). Mueller alleged in his disability report that he suffers from a disability due to left ankle and back pain and depression. (Tr. 232.) The Social Security Administration denied Mueller's application for benefits initially (Tr. 88-92.) In a decision dated March 5, 2010, Mueller was awarded SSI benefits beginning as of November 2009. (Tr. 93-104.) Mueller filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 43-44.) On April 1, 2011, following

a hearing, the ALJ issued a partially favorable decision, finding that Mueller was disabled from May 5, 2006 until December 9, 2008, but not thereafter. (Tr. 17-42.)

On January 16, 2013, the Appeals Council denied Mueller's request for review. (Tr. 1-4.) The decision of the ALJ thus stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Mueller filed this appeal on March 7, 2013. (ECF No. 1). The Commissioner filed an Answer. (ECF No. 10.) Mueller filed a Brief in Support of his Complaint. (ECF No. 15.) The Commissioner filed a Brief in Support of the Answer. (ECF No. 21). Mueller has not filed a Reply Brief in Support of his Complaint.

## II.     Decision of the ALJ

The ALJ determined that Mueller met the insured status requirements of the Social Security Act as of May 5, 2006, the date the claimant became disabled. (Tr. 24.) The ALJ found that Mueller had not engaged in substantial gainful activity since May 5, 2006, the alleged onset date of disability. (Tr. 25.) The ALJ determined that Mueller had the severe impairments of depression, anxiety disorder, and lumbar spine degenerative disc disease status post-surgery. (Id.) Considering all of the evidence, the ALJ found that Mueller had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 from May 5, 2006 through December 9, 2008, the period during which Mueller was disabled. (Tr. 25.)

The ALJ found that Mueller had the residual functional capacity ("RFC") from May 5, 2006 through December 9, 2008 to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that Mueller would be unable to sustain competitive employment on a regular and continuing basis. (Tr. 26.) The ALJ found that from May 5, 2006 through December 9, 2008, Mueller was unable to his perform past relevant work. (Tr. 27.) The ALJ

held that from May 5, 2006 through December 9, 2008, considering Mueller's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed.  (Tr. 27.)  Thus, the ALJ discerned that Mueller was under a disability, as defined by the Social Security Act, from May 5, 2006 through December 9, 2008.  (Tr. 28.)

The ALJ, however, determined that Mueller experienced medical improvement as of December 10, 2008, the date Mueller's disability ended.  (Tr. 28.)  The ALJ noted that the treatment records from Dr. Thomas Lee, Mueller's surgeon, revealed that his medical condition significantly improved following his back surgeries. (Id.)  Dr. Lee opined that Mueller could function in the medium exertional category (i.e., lifting, carrying, pushing, or pulling 50 pounds occasionally and 25 pounds frequently; standing or walking 6 hours in an 8-hour workday; and sitting 6 hours in an 8-hour workday). (Id.)  Dr. Lee further stated that Mueller would have additional permanent restrictions such as no lifting more than 30 pounds on an occasional basis, no carrying more than 40 pounds, and no sitting more than two hours with 10 to 15 minute standing or walking breaks.  (Id.)  Thus, the ALJ held that beginning on December 10, 2008, Mueller did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2) and 416.994(b)(5)(i)).  (Tr. 28-29.)

The ALJ noted that Mueller suffered from degenerative disc disease of the lumbar spine, but held that the medical evidence did not satisfy the criteria of section 1.04.  (Tr. 29.)  The ALJ

stated that that record was devoid of evidence of nerve root compression, spinal arachnoiditis,[1] or lumbar spinal stenosis with accompanying ineffective ambulation. (Id.)

The ALJ discerned that Mueller's mental impairments, considered singly and in combination did not meet or medically equal the criteria of the listings 12.04 and 12.06. (Tr. 29.) The ALJ also considered whether the "paragraph B" criteria were satisfied.[2] The ALJ determined that Mueller's mental impairments resulted in no more than a mild limitation in activities of daily living; mild restrictions in social functioning, moderate difficulties in concentration, persistence or pace; and no episodes of decompensation, which have been of extended duration. (Id.) Because Mueller's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ held that Mueller's condition did not satisfy the "paragraph B" criteria. (Id.) The ALJ also found that based upon the evidence presented that the "paragraph C" criteria were not satisfied. (Id.)[3] The ALJ determined that, with regard to Listing 12.06, the record does not reflect a complete inability to function independently outside the area of one's home. (Id.)

---

[1] "Arachnoiditis is a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surrounds and protects the nerves of the spinal cord. It is characterized by severe stinging, burning pain, and neurological problems." See http://www.webmd.com/pain-management/guide/pain-management-arachnoiditis.

[2] For the "paragraph B" criteria to be satisfied, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. (Tr. 29.)

[3] To satisfy the "paragraph C" criteria of listing section 12.04, the record must contain a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1) repeated episodes of decompensation, each of extended duration; 2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." (Tr. 29.)

The ALJ found that, beginning on December 10, 2008, Mueller had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he should never climb ladders, ropes, or scaffolds; additionally, Mueller could only occasionally climb ramps or stairs, stoop, crouch, crawl and balance; finally, Mueller was limited to work that is simple, routine, and repetitive.   (Tr. 30.)   The ALJ found that the medically determinable impairments could reasonably be expected to cause Mueller's alleged symptoms, but that Mueller's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC the ALJ assigned to Mueller.   (Tr. 31.)

In support of this RFC finding, the ALJ found that "the objective evidence does not demonstrate impairments that could account for the severe symptoms and limitations alleged by [Mueller] that preclude work activities."  (Tr. 31)   The ALJ noted that he had back surgeries on June 22, 2007 and February 22, 2008.  (Id.)  A computer tomography (CT) scan of the Mueller's lumbar spine, dated April 7, 2009, revealed postoperative changes status post fusion of L4 and L5 and mild spondylosis at L2-L3.  (Id.)  The CT scan showed no significant encroachment upon the canal or neural foramina.  (Id.)

The ALJ also found that Mueller's allegations regarding pain and limitations were also inconsistent with his reports to his treatment doctors.  (Tr. 31.)  The ALJ noted that on several occasions, Mueller reported only occasional back pain.  (Id.)  Despite this credibility issue, the ALJ, nevertheless, found sufficient evidence in the record to establish a severe impairment involving Mueller's lumbar spine.  (Id.)   Based upon this, the ALJ stated that he reduced Mueller's RFC "to accommodate all credible limitations resulting from these impairments."  (Id.)

In addition, the ALJ found that Mueller's treatment record after December 9, 2008 did not support a finding of total disability.  (Tr. 31.)  The ALJ stated that Mueller had continued

with a relatively conservative and routine treatment since December 9, 2008. (Id.) The ALJ noted that Mueller continued to have some pain and his doctors have prescribed pain medications such as Percocet, Vicodin, and Darvocet. (Tr. 31-32.) The ALJ noted that prior to December 9, 2008, Mueller had experienced improvement with physical therapy, but he failed to continue to attend these treatments. (Tr. 32.) The ALJ noted that Dr. Prithvi Singh opined that Mueller seemed to be more dependent on his medications. (Tr. 32.) Thus, the ALJ held that the lack of significant medical treatment since December 2008 and continued conservative treatment supports a finding that Mueller's impairments were not as significant as alleged. (Id.)

Further, the ALJ found that Mueller's allegations of quite limited daily activities were not supported by the medical record. (Tr. 32.) The ALJ found that Mueller's allegations could not be objectively verified with any reasonable degree of certainty. (Id.) Second, even if Mueller's activities were truly limited, the ALJ stated that it was difficult to attribute those limitations to Mueller's medical condition, as opposed to other factors, given the weak medical evidence. (Id.) Finally, in 2008, Mueller reported walking two miles each day, which was inconsistent with his testimony, and eroded his credibility. (Id.)

The ALJ considered Mueller's relatively consistent work history. (Tr. 32.) The ALJ agreed with Mueller that he could not perform his past work, but the ALJ found that he could still perform other work and that his past relevant work did not add significant probative weight to his allegations concerning his ability to sustain regular and continuing work at other exertional levels. (Id.)

The ALJ found that Mueller's physical impairments, although not entirely credible, required a reduction of his RFC. (Tr. 33.) Relying in part on the restrictions placed by Mueller's treating surgeon, the ALJ found that claimant would only be capable of work at the light

exertional level (i.e., lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; standing or walking six hours in an eight-hour workday; and sitting two hours in an eight-hour workday).  (Id.)  The ALJ found that Mueller's subjective complaints did not warrant any additional limitations beyond those in this RFC.

The ALJ also adjusted Mueller's RFC due to his alleged mental impairments, anxiety and depression.  (Tr. 33-34.)  The ALJ noted that symptoms of these conditions only appeared in the record as of July 2009.  Mueller only began treatment with Dr. Binwant Singh, a psychiatrist, in August 2009; prior to August 2009, Mueller received no psychiatric treatment.  (Tr. 33.)  Dr. Singh has prescribed Xanax, Celexa, Lithium, and Trazapam.  (Id.)  The ALJ, however, was concerned by Mueller's apparent alcoholism.  (Tr. 33-34.)  The ALJ discerned that his alcohol abuse was not "material" (see Social Security Ruling (SSR) 13-2p), but that his substance abuse did not lend credibility to his allegations of disabling mental impairments.  (Tr. 34.)  The ALJ found that if Mueller continued to abuse alcohol while taking medications and while in mental health treatment, then his treatment could not be completely effective.  (Id.)

When determining Mueller's RFC due to mental impairments, the ALJ discerned that Mueller's impairments would limit his ability to perform basic mental work activities, but those limitations would not be totally disabling.  The ALJ reported that Mueller had alleged limited activities of daily living due to physical problems, not mental.  (Tr. 34.)  Thus, the ALJ found only a mild limitation in activities of daily living due to mental impairments, especially when treated properly.  (Id.)  The ALJ also found that Mueller's claims that he cannot function around people or in crowds were not credible because he attended church and went to the grocery store. (Id.).  Therefore, the ALJ found mild difficulties in social functioning.  The ALJ further found that Mueller had moderate limitations regarding concentration, persistence, and pace due to

anxiety, depression, and side effects of medications. (Id.) Finally, the ALJ found that Mueller had not experienced an episode of decomposition of an extended duration. (Id.)

In total, the ALJ held that Mueller's mental impairments were "severe" and required a reduction of his RFC. (Tr. 34.) Due to Mueller's limitations in concentration, persistence and pace, the ALJ found that Mueller would be limited to work that was simple, routine, and repetitive. (Id.) The ALJ, however, found that Mueller's allegations of inability to function due to mental deficits were not supported by the medical record and, therefore, were not given great weight. (Id.)

The ALJ stated that he considered the opinion of Dr. Dwight Wiotesheck, who evaluated Mueller and opined that he was unable to work due to excruciating pain in his lower back and left ankle. (Tr. 34.) Dr. Wiotesheck's opinion, however, was based primarily on Mueller's subjective complaints, which the ALJ had previously discounted. (Tr. 35.) Further, Dr. Wiotesheck saw Mueller only once, on October 21, 2009, and was not his treating physician, and his opinion contrasted sharply with the other evidence in the record and the opinion of Mueller's treating surgeon. (Id.) Therefore, the ALJ gave Dr. Wiotesheck's opinion little weight. (Id.)

The ALJ also considered the opinion of Dr. Thomas Musich, who performed an independent medical evaluation on May 12, 2010. (Tr. 35.) Dr. Musich found that Mueller could perform no lifting greater than 25 pounds; work above or below floor level; or operate any commercial/industrial power tools or vehicles; he also opined that Mueller required limited restrictions in sitting and standing and should be allowed to move about freely. (Tr. 35.) The ALJ afforded Dr. Musich's opinion little weight because Dr. Musich was not Mueller's treating physician and only evaluated him one time, Dr. Musich relied heavily on Mueller's subjective complaints and limitations, and Dr. Musich's opinion contrasted greatly with the opinion of Dr.

Lee.  (Id.)  The ALJ found that the medical record did not indicate that Mueller's condition worsened greatly after his release from Dr. Lee's care and, therefore, the ALJ found Dr. Musich's opinion was inconsistent with the record.  (Id.)  In addition, Dr. Musich requested Mueller undergo vocational rehabilitation to determine whether he would be capable of obtaining and maintaining employment in a full time labor market.  (Id.)  Although Dr. Musich recommended that Mueller undergo vocational rehabilitation, Mueller never sought such services.  (Id.)  A year later, on March 4, 2011, Mueller saw Gary Weimbolt, a vocational rehabilitation consultant to assess his access to the labor market.  (Id.)  Weimbolt concluded that Mueller had a total loss of access to the open competitive labor market and was totally disabled from employment.  (Id.)  The ALJ, however, discounted Weimbolt's opinion because, in evaluating Mueller, Weimbolt combined the restrictions from both Dr. Lee and Dr. Musich, whose opinions were inconsistent with the record.  (Id.)  Because Weimbolt included limitations provided by Dr. Musich, the ALJ determined that Weimbolt's opinion was inconsistent with the medical records.  (Id.)

Additionally, the ALJ considered the medical opinion of Dr. Jennifer E. Brockman, who diagnosed Mueller with Major Depressive Disorder—Single Episode, Severe, Without Psychotic Features and Panic Disorder with Agoraphobia.  (Tr. 35.)  The ALJ noted that the medical record revealed only a single episode of panic disorder and Mueller's testimony did not reflect a significant number of panic attacks or difficulties associated with agoraphobia.  (Tr. 36.)  Dr. Brockman identified Mueller's alcohol abuse but did not address its effect on his mental impairments.  (Id.)  Dr. Brockman only saw Mueller once prior to providing her opinion.  (Id.)  Although Dr. Brockman discerned that Mueller was completely disabled due to his physical and

psychiatric impairments, the ALJ found her diagnoses inconsistent with the record and afforded her opinion little weight.  (Id.)

The ALJ also considered the "Function Report Adult—Third Party," dated December 24, 2009, which was filled out by Mueller's mother, Rosemary Mueller.  (Tr. 36.)  The report indicated that Mueller cooked meals, performed light housework and handled money.  The ALJ stated that the report described Mueller's limitations, which were not activities that one would associate with a totally disabled individual.  The ALJ granted this report weight to the extent that it was consistent with the record and the ALJ's findings.  (Id.)

Based upon all of the foregoing, the ALJ held that Mueller retained the RFC for the light range of work described above.

The ALJ further concluded that, because of Mueller's medical improvement, his functional capacity for basic work activities increased. (Tr. 36.)  The ALJ found that beginning on December 10, 2008, Mueller has been unable to perform past relevant work.  (Id.)  The ALJ nevertheless found that Mueller was "not disabled", and his disability ended as of December 10, 2008.  (Tr. 36-37.)

Mueller appealed contending that the ALJ erred by not giving enough weight to the opinions of his treating physicians.  Mueller also asserted that the ALJ erred by arbitrarily determining a RFC that did not include proper limitations.  The Commissioner contended that the ALJ's decision was supported by substantial evidence on the record as a whole.

## III.    Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A.    Hearing Testimony

#### 1.    Mueller's Testimony

Mueller testified as follows. Mueller was born in 1967. (Tr. 49.) Mueller completed 9th grade in school but did not get his GED. (Tr. 50.) He has no formal vocational training. (Tr. 52.) He has no computer skills. (Tr. 52.)

Mueller lives with his spouse on the top floor of a two family flat. (Tr. 50.) Mueller has to use a bannister to go up the 13-16 steps to his flat. (Id.)

Mueller's most recent employment was at St. Peter and Paul Church where he was the director of maintenance. (Tr. 53.) Along with maintaining the buildings, Mueller also did the yard work and snow removal. (Id.) During this time, Mueller also worked for Miller Residential, providing bids for painting and tuck-pointing jobs. (Tr. 55.)

Prior to working for St. Peter and Paul Church, Mueller took care of his parents during their illnesses. (Tr. 54.) Prior to that, Mueller was a truck driver for Garco Wine. (Id.)

In May 2006, Mueller sustained an injury to his left ankle and back while working at St. Peter and Paul Church. (Tr. 56-59.) Mueller must wear a brace on his ankle at all times. (Tr. 57.) The brace prevents his ankle from rolling. (Tr. 58.) His ankle constantly aches and causes him to have pain up to his chin and walk with a limp. (Tr. 57-58.) Mueller has pain in his low back all the time, even when he is on medication. (Tr. 59-60.) The medicine just "takes the edge off." (Tr. 60.) Mueller takes Vicodin, Flexeril, Amitripyline, Piroxicam, and Lithium for pain four times a day. (Tr. 61.)

Mueller states it is painful for him to climb stairs; he must hold on to the bannister the whole time and cannot carry anything while doing so. (Tr. 61.) If Mueller goes grocery shopping, he must be on pain medication by the time he reaches home. (Tr. 62.) Mueller can lift 30 pounds once, but not repeatedly. (Id.) He cannot repeatedly bend and stoop. (Tr. 63.) Mueller gets pain within 45 minutes of standing in one place. (Id.) Mueller can sit for about an

hour before he needs to get up and walk around.  (Id.)  He mows the lawn in very small increments.  (Tr. 64.)

Once a month, Mueller sees a psychiatrist, Dr. Singh, who treats Mueller for anxiety, frustration, and depression.  (Tr. 64-65.)[4]  He currently takes xanax, celexa, lithium, and torazepam for his mental health issues.  (Tr. 65.)  These medications cause him to have trouble concentrating, forgetfulness, and drowsiness.  (Tr. 65.)  His depression and anxiety cause him to be unable to function around people.  (Tr. 65-66.)  He cannot handle crowds.  (Tr. 66.)  He occasionally goes to church, but he has to walk around in the back.  (Tr. 66.)  He can read a newspaper.  (Tr. 66.)  He can handle money.  (Tr. 67.)

He takes out the trash and helps to keep the house clean by vacuuming, mopping, and laundry.  (Tr. 69.)  Mueller barbecues.  (Tr. 69.)  Twice a month he sees friends at his home for socializing.  (Tr. 70.)  He leaves the house twice a week to grocery shop but he cannot get everything in the house at once because it is too hard.  (Id.)  He checks on his parents.  (Id.)  Within the last two years, he tried to work but was unable to climb a ladder or repetitively pick things up.  (Tr. 71-72.)  It takes Mueller three days to cut his grass.  (Tr. 72.)

### 2.    Vocational Expert's Testimony

Vocational Expert Dolores E. Gonzalez testified as follows.  For hypothetical one, the ALJ told Gonzalez to assume an individual who is capable of light work, who can occasionally stoop, never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally crouch, occasionally crawl and occasionally engage in activities that require balance.  (Tr. 77.)  Gonzalez determined that such individual could perform Mueller's prior work as an estimator as well as other nationally and locally available work as a cashier and ticket taker.  (Tr. 77-78.)

---

[4] A different "Dr. Singh" is his primary care physician who prescribes his pain medications.  (Tr. 64.)

For hypothetical two, the ALJ asked Gonzalez to determine the same hypothetical individual but the exertional limitation shifted from light to sedentary. (Tr. 78.) Gonzalez stated that Mueller could perform his past work as an estimator but not the work as a cashier or ticket taker because those jobs were not sedentary. (Tr. 78.) However, other sedentary jobs, such as table worker, call out operator, and order clerk would be available. (Tr. 79.)

For hypothetical three, the ALJ asked Gonzalez to assume the individual was limited as in hypothetical two but that the individual also could only perform simple, routine, and repetitive tasks. Gonzalez stated that the individual would be able to perform all of the jobs listed in the second hypothetical except for estimator position. (Tr. 79.) All of the other jobs were unskilled.

For hypothetical four, the ALJ asked Gonzalez to assume the hypothetical situation number one, but include a sit/stand option that would allow an individual to alternate between sitting or standing positions every hour. (Tr. 80.) Gonzalez said that there were order caller positions and cashier jobs that were totally standing. (Tr. 80-81.) In addition, Gonzalez said there were school bus monitor positions where the person could sit or stand. (Tr. 81.)

For hypothetical five, the ALJ asked Gonzalez to assume the hypothetical limitations expressed in hypothetical four, except moving the individual to sedentary, but still including the sit/stand option. (Tr. 81.) Gonzalez said that such an individual would be able to work as a call out operator, order clerk, and table worker. (Tr. 81-82.) Gonzalez said there would be a 50% reduction in the number of table workers but not in the other positions. (Id.)

For hypothetical number six, the ALJ asked Gonzalez to assume the limitations in hypothetical five, but the individual could not perform full-time employment on a continuous basis and would likely be absent from work 3 or more days per month. (Tr. 82.) Gonzalez said that such limitation would preclude employment in the competitive job market. (Id.)

**B.     Medical Records**

Mueller's relevant medical records are summarized as follows:

Mueller had an accident on May 5, 2006.  Dr. Thomas K. Lee reported that Mueller had evidence of disc bulging at both L4-5 and L5-S1 with an incompetent anulus.  (Tr. 390.)  At surgery, Mueller showed a disc fragment intervening at the L5-S1 annular defect.  Mueller required two surgeries on June 22, 2007 and February 22, 2008, but he eventually achieved a solid fusion.  (Id.; Tr. 342, 348, 391, 295.)

On March 12, 2008, Dr. Lee saw Mueller for a follow-up.  (Tr. 382.)  Mueller indicated that he could not wear his brace because of back pain.  Dr. Lee noted that the incision was healing and renewed his medication.  (Id.)

On March 20, 2008, Dr. Lee saw Mueller for a follow-up.  (Tr. 339.) Mueller's incision was well-healed and he had tenderness over the left iliac crest.  Dr. Lee cleared Mueller for no lifting more than 10 pounds, no bending, and no climbing ladders.  (Id.)

On April 17, 2008, Dr. Lee saw Mueller, who had pain at L5-S1.  (Tr. 383.)  Mueller reported wearing his TENS unit and walking.  The x-rays showed the implant was in a good position.  Dr. Lee began decreasing Mueller's pain medication.  (Id.)

On May 15, 2008, Mueller was showing progress and Dr. Lee discontinued his Oxycotin and changed his prescription to hydrocodone.  (Tr. 337.)

On June 19, 2008, Dr. Lee saw Mueller who stated he experienced discomfort at L5-S1. (Tr. 335.)  Mueller said that he feels like something is out of place, but not all of the time.  (Id.) Dr. Lee said Mueller was mildly tender at L5-S1, both sacroiliac joints, and had fluid flexion. (Id.)  Dr. Lee stated that Mueller should go to therapy for strengthening and to increase range of motion tolerance.  (Id.)  Dr. Lee also advanced Mueller's restrictions.  (Id.)

On August 21, 2008, Dr. Lee reported that Mueller was pleasant and in no acute distress. (Tr. 385.) Dr. Lee stated that Mueller continued to show improved strength and conditioning at each visit and the x-rays were consistent with healing fusion. (Id.)

On September 18, 2008, Dr. Lee saw Mueller, who reported that he had low back pain intermittently, if he sleeps wrong or has physical therapy three days in a row. (Tr. 386.) Mueller had not really started work conditioning. He said that he walks two miles a day and that it is hard to lift from the ground. Mueller said that he takes 5-6 Vicodin a day if he has therapy. On examination, Dr. Lee found that Mueller was tender at S1, and transitions to stand were brisk and fluid. Dr. Lee wanted to advance Mueller to work hardening. Dr. Lee kept Mueller on the same restrictions except for occasional ladder climbing. (Id.)

On October 21, 2008, Mueller complained of pain with bending and right-sided low back pain. (Tr. 387.) Mueller could carry and lift, if there was no bending. Mueller was in no acute distress. He changes positions frequently. He had slight fullness over the area on the left at L4-L5 and is tender over that facet area. Dr. Lee went over his work hardening assessment and updated his restrictions. If the CT scan showed no evidence of nonunion then Dr. Lee would consider getting Mueller off his pain medications. (Id.)

On November 11, 2008, Mueller was seen by Dr. Lee for low back pain, left-sided L4-5 paraspinal pain. (Tr. 388.) The CT scan showed a healed fusion at L4-5 and L5-S1. Dr. Lee ordered a functional capacity evaluation. (Id.)

On December 9, 2008, Dr. Lee saw Mueller, who complained of pain at L5-S1. (Tr. 389.) Mueller was pleasant and in no acute distress. His incision was well healed; his posture was upright; and transitions were fluid. He was tender at L5. Mueller's Functional Capacity Evaluation showed that he was functioning in the medium demand category. (Id.) Mueller

passed 10 of the 10 ability criteria in the Functional Capacity Evaluation. (Tr. 390.) Dr. Lee gave Mueller the permanent restrictions of no lifting more than 30 pounds on an occasional basis, no carrying more than 40 pounds, no sitting more than two hours, with a 10 to 15 minute standing or walking break. Dr. Lee said Mueller could do occasional ladder climbing. (Tr. 389.) Dr. Lee gave Mueller a prescription for Tramadol and suggested that he obtain a primary care physician to assist with long-term pain management needs. (Id.) Dr. Lee released Mueller from his care.

On January 19, 2009, Dr. Lee provided a permanency (disability) rating for Mueller. (Tr. 390). Dr. Lee opined that Mueller had a total of 18% permanent partial disability at the level of the whole body for his lumbar spine condition. Dr. Lee believed that 10% of that disability was due to Mueller's May 5, 2006 accident and 8% of that was due to preexisting conditions, including a 20 year smoking history combined with natural aging.

On February 13, 2009, Mueller appeared before Dr. Singh with complaints of back pain, high blood pressure, and difficulty sleeping. (Tr. 440.)

On March 13, 2009, Mueller had an appointment with Dr. Singh and complained of back pain and a cough. (Tr. 439.)

On April 3, 2009, Mueller had an appointment with Dr. Singh and complained of back pain. (Tr. 438.)

On April 7, 2009, Mueller had a CT scan that showed postoperative changes after the fusion of L4-S1 and mild spondylosis at L2-3. (Tr. 437.) There was no significant stenosis.

On April 17, 2009 and May 26, 2009, Mueller was seen for back pain. (Tr. 434-35.) Dr. Singh again referred Mueller to physical therapy. On April 17, 2009, Dr. Singh opined that Mueller was too dependent upon his medication. (Tr. 434.)

On July 17, 2009, Mueller complained of back pain and was said to have a history of anxiety. (Tr. 432.) Dr. Singh recommended pain management.

Mueller was seen for an initial psychological visit on August 19, 2009. (Tr. 428-30.) He complained of anxiety, depression, and insomnia. (Tr. 428.)

On November 24, 2009, Mueller underwent a medical evaluation by Dr. Dwight Woiteshek. (Tr. 406.) Dr. Woiteshek opined that Mueller had reached maximum medical improvement and was of the opinion that Mueller was no longer able to obtain gainful employment in the open labor market due to chronic pain in his lower back and left ankle. (Tr. 406-11.) Dr. Woiteshek indicated that additional palliative treatment would be necessary, such as physical therapy to the lower back and left ankle, pain management techniques to the lower back, and orthotic treatment for the left ankle. (Tr. 410.)

On February 2, 2010, Dr. Binwant Singh wrote a doctor's note to excuse Mueller from jury duty. (Tr. 520.) Mueller was seen by Singh Medical Specialists on February 12, 2010 for back pain and ankle pain. (Tr. 517.) Mueller was assessed with back pain and prescribed Vicodin, Flexeril, Feldene, and Amitriptyline. (Tr. 519).

On April 9, 2010, Mueller saw Dr. Singh and complained of back and ankle pain. (Tr. 515-16.)

On May 12, 2010, Mueller saw Dr. Thomas E. Musich. (Tr. 485-91.) Dr. Musich noted that Mueller had no previous psychiatric history prior to his work injury. Dr. Musich discerned that Mueller has a permanent partial disability of 35% of the left ankle, along with an additional permanent partial disability of 70% of the man as a whole referable to his lumbosacral pathology. (Tr. 490.) Dr. Musich believed that Mueller's injuries would pose a chronic hindrance in his routine activities of daily living and that Mueller will require pain management

indefinitely due to the injury. (Id.) Dr. Musich recommended that Mueller continue to observe proper body mechanics while performing his routine activities of daily living and continue to observe permanent restrictions of no lifting greater than 25 pounds, working above or below floor level, operating any commercial or industrial power tools or vehicles, and he required limited restrictions in sitting time, standing time, and that he be afforded the opportunity to move freely from either sit to stand, stand to sit, or occasionally lie down in an attempt to relieve post traumatic pain. (Id.) Dr. Musich recommended that Mueller undergo vocational rehabilitation to determine whether he was capable of obtaining employment on the open labor market. Dr. Musich stated that if a certified vocational specialist found Mueller to be unable to obtain and maintain full time employment, then it was Musich's opinion that Mueller was totally and permanently disabled as a result of his May 2006 accident. (Tr. 490-91.)

On December 10, 2010, Mueller was seen by Dr. Jennifer Brockman, who prepared a psychiatric IME report. (Tr. 492-98.) Dr. Brockman noted that Mueller's use of alcohol was "problematic" and that he should be counseled to abstain from using it entirely as it can worsen psychiatric symptoms. (Tr. 498.) In addition, Dr. Brockman cited the danger in mixing alcohol with Mueller's current medications. (Id.) She noted that other health professionals have also discouraged him from drinking. (Id.) Dr. Brockman opined that Mueller suffers from chronic psychiatric illness as a result of his May 5, 2006 injury. (Id.) Dr. Brockman rated his permanent psychiatric disability at 70%, which accounts for limitations in performing activities of daily living, social functioning, concentration, and adaptation in work-like settings. (Id.) Dr. Brockman opined that Mueller was unable to compete in the open labor market because of his combined work physical and psychiatric impairments. (Id.)

On March 4, 2011, Gary Weimholt prepared a Vocational Rehabilitation Assessment/Evaluation based upon his examination on January 12, 2011. (Tr. 499-514.) Weimholt's opinion was that Mueller was "both unemployable and also not placeable in the open competitive labor market." (Tr. 513.) Weimholt stated that Mueller was a possible candidate for retraining but he would not be able to maintain a full-time school schedule. (Id.) Thus, Weimholt believed that Mueller had a total loss of access to open competitive labor market and was totally vocationally disabled from employment. (Id.)

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  Id.

Fourth, the impairment must prevent claimant from doing past relevant work.[5]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her RFC.  Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008); see also Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  Id.; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  Id.; see also 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national

---

[5] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

economy that the claimant is able to perform."  Goff, 421 F.3d at 790; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).   The Commissioner must prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.   "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  Id.; see also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole.  See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994).   "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence.  Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or  deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision."  Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently.  Krogmeier, 294 F.3d at 1022.

## V.      Discussion

Mueller asserts two errors on appeal.  First, Mueller asserts that the RFC, as determined by the ALJ, is not supported by "some" evidence.  Second, Mueller contends that the hypothetical question posed to the vocational expert did not capture the concrete consequences of his impairment and, therefore, the response of the vocational expert to the hypothetical question does not represent substantial evidence.  The Commissioner contends that the ALJ properly considered the medical opinion evidence and properly considered the Mueller's impairments when he determined his RFC and when he posed the hypothetical question to the vocational expert.

### A.      Medical Opinion Evidence in Determining the RFC

As previously stated, the ALJ in this case determined that Mueller's RFC was:  can perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he should never climb ladders, ropes or scaffold; in addition, Mueller should only occasionally climb ramps or stairs, stoop, crouch, crawl and balance; finally, Mueller should be limited to work that is simple, routine and repetitive.  (Tr. 30.)  Mueller asserts that the ALJ's findings of RFC are not supported by "some" evidence. (ECF No. 15 at 7-13.)  See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)("[S]ome medical evidence … must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace.")(internal citations omitted).  Mueller argues that the ALJ did not account for how "Percocet and Vicodin, strong narcotic medications would in fact not be indicative of disabling pain."  (ECF No. 15 at 11.)  Mueller also takes issue with the ALJ affording the opinion of Dr. Lee from December 2008 great weight and discrediting the opinions of Dr. Musich, Dr. Woiteshek, Dr. Brockman, and the vocational expert, Gary Weimholt.  (ECF

No. 15 at 12.)  Mueller argues that under 20 C.F.R. 404.1527, the Commissioner must consider the examining relationship, the supportability, the consistency of the medical opinion, the specialization of the medical source, and other factors brought to the Commissioner's attention bearing upon the weight the medical opinion should be accorded.  (ECF No. 15 at 13.)  Mueller contends that the ALJ only considered the fact that these individuals were not treating physicians and/or had seen Mueller only one time.  (Id.)  Mueller argues that the ALJ failed to consider the fact that these individuals were specialists in their fields, that they examined Mueller, and that they reviewed Mueller's medical history in forming their opinions.  (Id.)

Essentially, Mueller's argument is that the ALJ failed to properly account for Mueller's complaints of disabling pain.  In particular, Mueller cites to his use of prescription medication as evidence of his disabling pain.

The Court finds that the ALJ properly credited the medical evidence that indicated that his pain was not as severe as Mueller claimed and properly discredited Mueller's subjective complaints.  "It is well-settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003) (citing Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir.1997)).  However, "[t]he ALJ may disbelieve subjective complaints 'if there are inconsistencies in the evidence as a whole.'" Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (quoting Goodale v. Halter, 257 F.3d 771, 774 (8th Cir.2001)). The Court "will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001).

In this case, the Court finds that the ALJ properly discredited the severity of Mueller's subjective complaints.  The ALJ found that the clinical and objective medical evidence was

inconsistent with Mueller's allegations of disability, including disabling pain. First, the medical evidence does not support the restrictions alleged by Mueller. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." Pearsall, 274 F.3d at 1218 (citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984)). "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Pearsall, 274 F.3d at 1218 (citing Polaski, 739 F.2d at 1322). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall, 274 F.3d at 1218 (citing Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987)). Here, Mueller reported activities that were inconsistent with the restrictions he alleged. While the ALJ found that Mueller had some "medically determinable" physical and mental impairments (Tr. 32, 34), the medical records provide some support that those impairments were not as disabling as he claimed and he retained the RFC for light work. Mueller told Dr. Lee that he was walking 2 miles per day. Mueller told the ALJ that he went to the grocery store, cut grass, and climbed steps. Mueller also had received only routine physical care and only one mental health visit since his treatment with Dr. Lee. The records are not replete with treatment as one would expect of someone with chronic back and ankle pain and immobilizing mental health issues. Thus, the ALJ properly gave less weight to Mueller's subjective complaints when determining his RFC.

Second, the Court finds it was proper for the ALJ to give greater weight to the opinion of Dr. Lee, Mueller's treating physician. Generally, a treating physician's opinion is given

controlling weight, but is not inherently entitled to it.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p; see also Hacker, 459 F.3d at 937.  When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions.  20 C.F.R. § 404.1527(a)(2); Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005).   Dr. Lee had a long-standing relationship with Mueller where he saw him at least every month.  Dr. Lee documented Mueller's progress and performed testing, such as x-rays, that further supported such progress. Based upon Dr. Lee's observations and the supporting medical evidence, the Court finds that the ALJ properly gave greater weight to the opinion of Dr. Lee.

Further, the Court finds that the ALJ's failure to include the alternating sitting and standing limitation that Dr. Lee included was not error; the ALJ properly found that it was not supported in the record.  At the time of Mueller's discharge from Dr. Lee's care, Dr. Lee discerned that Mueller required the following restrictions:  the permanent restrictions of no lifting more than 30 pounds on an occasional basis, no carrying more than 40 pounds, no sitting more than two hours, with a 10 to 15 minute standing or walking break.  Dr. Lee said Mueller could do occasional ladder climbing. (Tr. 389.)  "[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir.2007).  The ALJ specifically stated that Mueller's "subjective complaints [did] not warrant any additional limitations beyond those

established in the [RFC] as … outlined in the decision." (Tr. 33.) Given the extent of physical activity that Mueller engaged in and the credibility determination already made by the ALJ, the Court finds that not including the sit/stand option as part of Mueller's RFC to be supported by some of the evidence.

In addition, the Court finds that it was not error for the ALJ to rely on Dr. Lee's opinions rather than the more recent opinions of the consulting physicians. In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b); see also Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." Id. The medical records do not indicate that Mueller's condition significantly worsened since his discharge from Dr. Lee's care. There is no evidence in the record that Mueller required additional restrictions after that date. As noted by the ALJ, the more recent medical records do not provide any basis to reject Dr. Lee's opinion. Mueller had experienced "routine and/or conservative treatment" since December 9, 2008. (Tr. 32.) Additionally, the April 7, 2009 CT scan showed postoperative changes after the fusion of L4-S1 and mild spondylosis at L2-3 but did not show significant stenosis. (Tr. 437.) Dr. Singh repeatedly recommended that Mueller

pursue physical therapy and indicated that Mueller was too dependent on his medication. (Tr. 434-35.) Thus, although Dr. Lee's opinion was not as recent as the opinions provided by the consulting physicians, it nevertheless is entitled to controlling weight because it is from a treating physician. See Hacker, 459 F.3d at 937. With respect to his mental condition, Mueller had no psychiatric treatment or hospitalizations until August 19, 2009. (Tr. 33, 428-30.) And, although Mueller told the ALJ that he saw his psychiatrist monthly, there was only one treatment note in the medical file. (Id.)

Finally, the Court finds that the ALJ properly gave less weight to the consulting physicians and vocational expert who only examined Mueller once before concluding that he was permanently disabled. The ALJ is not required to give controlling weight to such an opinion. See also Ellis, 392 F.3d at 994 ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight."). In addition, these physicians based their findings of disability largely upon Mueller's own subjective complaints, which were properly discounted by the ALJ. Therefore, the Court finds that the fact that the ALJ largely discredited the consulting experts' opinions does not mean that the ALJ's opinion was not supported by "some" weight.

Thus, the Court finds that the substantial evidence supports the ALJ's finding that Mueller was less than fully credible and that the ALJ's findings are consistent with Dr. Lee's assessment, which was properly given greater weight. The Court notes that, although Plaintiff claims he suffers from significant mental and physical restrictions, his testimony before the ALJ indicated that he was able to perform all of the essential functions of daily living. Moreover, the Court finds that the ALJ provided ample basis for giving Mueller's subjective complaints and the

opinions of Dr. Musich, Dr. Woiteshek, and Dr. Brockman less weight. As indicated, none of these physicians were Mueller's treating physician and they only examined Mueller on one occasion. Therefore, the Court finds that substantial evidence on the record as a whole supports the ALJ's determination of the medical opinion evidence.

### B. Hypothetical Question

The ALJ in this case determined that Mueller's RFC was: can perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should never climb ladders, ropes or scaffold; in addition, Mueller should only occasionally climb ramps or stairs, stoop, crouch, crawl and balance; finally, Mueller should be limited to work that is simple, routine and repetitive. (Tr. 30.) Mueller claims that the ALJ erred in failing to include the additional restriction stated by Dr. Lee that Mueller needed to "change positions between sitting and standing frequently" (Tr. 28) and not sitting for more than two hours and needing a 10-15 minute standing or walking break (Tr. 28.) The Court finds that the exclusion of the sit/stand option was appropriate for several reasons.

First, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir.2006) (quotation and citation omitted); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir.2001). Here, the ALJ properly included only those limitations supported by the record as a whole in the hypothetical. See Haggard v. Apfel, 175 F.3d 591, 595, (8th Cir.1999) (holding an ALJ need not include additional complaints in the hypothetical not supported by substantial evidence). The ALJ specifically concluded that Mueller's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ discerned that Mueller's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent that they were inconsistent with his RFC assessment. (Tr. 31.)  Based on the Court's previous conclusion, that "the ALJ's findings of [Mueller's] RFC are supported by substantial evidence," the Court holds that "[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits." Lacroix, 465 F.3d at 889.  Accordingly, the ALJ's hypothetical was proper. "A vocational expert's testimony 'based on a properly phrased hypothetical question constitutes substantial evidence.' " Haggard, 175 F.3d at 595 (quoting Roe v. Chater, 92 F.3d 672, 675 (8th Cir.1996)).

In addition, even if this limitation should have been included in the RFC determined by the ALJ, the Court finds that the exclusion of this limitation was a harmless error.  "An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Upon questioning by the ALJ, the vocational expert, Ms. Gonzalez, stated that jobs existed in the national and local economy that accommodated the sit/stand option.  (Tr. 81-82).  Ms. Gonzalez stated that the job positions of school bus monitor, call out operator, order clerk, and table worker all existed and allowed for sitting and standing option.  (Id.)  The ALJ specifically found that there existed a significant number of jobs that Mueller can perform.  (Tr. 37.)  Thus, the Court finds no error in excluding the sit/stand accommodation because such jobs existed in the local and national economy and, therefore, the exclusion of this limitation had no practical effect on the finding that Mueller was not disabled.

## VI.    Conclusion

Based on the foregoing, the Court will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 27th day of March, 2014.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE